NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0417n.06

Case No. 22-3508

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 02, 2023
DEBORAH S. HUNT, Clerk

MINDY CARPENTER; SHAWN CARPENTER, )
)
    Plaintiffs-Appellants, )
)
v. )
)
LIBERTY INSURANCE CORPORATION, )
)
    Defendant-Appellee. )
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

Before: KETHLEDGE, THAPAR, and MATHIS, Circuit Judges.

THAPAR, Circuit Judge. When a fire broke out at Mindy and Shawn Carpenter's house, Liberty Insurance Corporation believed they had started the blaze themselves. So Liberty refused to cover the damage. The Carpenters sued. And even though Liberty later approved a payout, the Carpenters believe they're entitled to more. The district court entered summary judgment for Liberty. We affirm in part and vacate in part.

I.

After Mindy and Shawn Carpenter's house caught fire, they filed a claim with their insurance company, Liberty Insurance Corporation. But when Liberty started investigating, red flags turned up. For one, the fire marshal concluded the fire was deliberately set. Yet there were no signs of forced entry. Indeed, the house doors were locked the morning of the fire, and the Carpenters were the only ones with keys. And even though the Carpenters went camping the night before, Mr. Carpenter was at his house the morning of the fire. Liberty also found motive: the

Carpenters appeared to be behind on their bills, and the house had significant mold growth and water damage in the basement.

Based on this investigation, Liberty concluded the Carpenters started the fire. Like most insurance policies, the Carpenters' excluded intentional losses. So Liberty denied their claim.

The Carpenters sued, alleging breach of contract and insurer bad faith under Ohio law. In addition to compensatory damages, they demanded consequential and emotional distress damages. The district court granted summary judgment to Liberty on the bad-faith claim. And it capped the Carpenters' potential recovery at their policy's limits.

During the litigation, Liberty learned the Carpenters had been fixing up their house. To Liberty, these repairs suggested they didn't start the fire. So Liberty reversed course: it agreed to reimburse them for certain repairs and a year of living expenses.

But the Carpenters believed Liberty owed them more. In their view, Liberty owed them the entire balance of their policy's repair and replacement coverage. They also demanded living expenses for the five years it took them to repair the house—not just the one year for which Liberty paid.

The parties agreed to resolve these issues through cross-motions for summary judgment. To facilitate this, they stipulated that the remaining claims hinged on a few, narrow questions about the Carpenters' coverage. The district court resolved these questions in Liberty's favor and granted it summary judgment on the remaining issues.

The Carpenters appeal that final judgment as well as the district court's earlier rulings on damages and the bad-faith claim.

## II.

We review the district court's grant of summary judgment de novo and draw all reasonable inferences in the Carpenters' favor. *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 424 (6th Cir. 2022). The three major issues in this appeal are bad faith, breach of contract, and damages.

## A.

*Bad Faith*. In Ohio, insurance companies owe their clients a duty of good faith. *See Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399 (Ohio 1994). An insurer breaches this duty when it refuses to pay a claim without "reasonable justification" in law or fact. *Id.* at 400.

## 1.

The Carpenters' insurance policy excludes intentional losses. In other words, if the Carpenters intentionally damage their house, Liberty need not pay. Ohio calls this the "arson defense." *Caserta v. Allstate Ins. Co.*, 470 N.E.2d 430, 433 (Ohio Ct. App. 1983). Under this defense, insurers can deny claims if (1) the fire was "incendiary," (2) the insured had a motive to start the fire, and (3) they had an opportunity to do so. *Id.* Liberty had enough evidence to support each element of the defense.

First, both parties agree the fire was incendiary—in other words, the fire was intentionally set, not a freak accident.

Second, Liberty could reasonably conclude the Carpenters had motive to burn their house. Their basement had recently flooded, leaving extensive mold and water damage. Credit reports showed that the Carpenters faced tax liens, late payments, and delinquent accounts. And their house was conspicuously empty: there was no television or cable box in the living room, no clothes in the bedroom closet, and no toiletries in the bathroom. Moreover, nobody could identify anyone else with a motive.

Third, Liberty could reasonably conclude the Carpenters had an opportunity to start the fire. Mr. Carpenter was at the house the morning of the fire, and there was no sign of forced entry.

Given these facts, Liberty was reasonably justified in applying the arson defense to the Carpenters' claim. Thus, Liberty's denial wasn't in bad faith.

2.

The Carpenters offer five counterarguments. None succeeds.

*First*, the Carpenters argue they weren't the only ones who could access their house. That's true, but it doesn't matter. The arson defense only requires that the Carpenters had an opportunity to start the fire—not the exclusive opportunity. *Caserta*, 470 N.E.2d at 433. The Carpenters cite one case suggesting otherwise, but that case didn't involve the arson defense or bad-faith claims. *See Gedra v. Dallmer Co.*, 91 N.E.2d 256 (Ohio 1950) (involving a negligence suit). So it doesn't apply here.

*Second*, the Carpenters argue the district court relied on inadmissible evidence when granting summary judgment. *See* Fed. R. Civ. P. 56(c)(2). In particular, they object to the court's consideration of (1) the Carpenters' credit reports, (2) laypeople's statements about mold in their basement, and (3) Mr. Carpenter's refusal to undergo a voice stress test after reporting the fire. Each of these objections fails.

The Carpenters claim their credit reports are hearsay and immaterial. They're wrong. First, the credit reports aren't hearsay. To be hearsay, a party must offer a statement to prove the truth of its contents. *See* Fed. R. Evid. 801(c)(2). But Liberty doesn't offer the credit reports to prove the truth of their contents—i.e., to show the Carpenters were *actually* financially distressed. Rather, Liberty offers the reports only to show it could reasonably conclude that they were. And

Liberty could reasonably conclude that even if the reports later turn out to be inaccurate. That means the reports aren't hearsay. *Id.*

The credit reports are also material. Evidence is "material" if it helps prove a fact that is at issue in a case. *McCormick on Evidence* § 185 (8th ed. 2020); *cf.* Fed. R. Evid. 401(b). At issue here is whether Liberty was reasonably justified in invoking the arson defense. Motive is an element of that defense, and the credit reports suggest Liberty could reasonably conclude the Carpenters had motive. After all, an insurance payout could have helped pay down those debts. Thus, the credit reports are material.

Next, the Carpenters argue that Liberty's inspector was not qualified to opine on the presence of mold. But it doesn't take "scientific, technical, or other specialized knowledge" to conclude the basement had mold. Fed. R. Evid. 701. Mold visibly coated their basement floor and stairwell. And both Liberty's employee and its consultant personally saw the mold, so their opinions about it are admissible. *Id.*

The Carpenters object to one more piece of evidence: Mr. Carpenter's refusal to undergo a voice stress analysis when firefighters arrived. But this doesn't pose an issue, either. Even ignoring his refusal, Liberty had enough evidence to reasonably conclude the Carpenters had motive and opportunity.

*Third*, the Carpenters allege that Liberty's investigation was so inept that it amounted to bad faith. In support of this allegation, they claim Liberty didn't follow national fire investigation guidelines. And they note Liberty didn't consult police about property crime in the area. But that isn't enough to show bad faith.

To be sure, egregiously inadequate investigations can constitute bad faith. In *Zoppo*, the Ohio Supreme Court reinstated a bad faith finding for an insurance company that denied a bar's

claim for fire damage. *Zoppo,* 644 N.E.2d at 400–01. There, the insurer failed to interview two patrons whom the bar had recently kicked out. *Id.* Those two had publicly claimed responsibility for attempted arson of the bar three weeks before the fire in question. *Id.* One of them even promised he'd go back to the bar to "finish the job." *Id.* Additionally, the insurance company never bothered to check where the bar's owner was on the day of the fire. *Id.*

Contrast that with the facts here. The Carpenters haven't identified anyone with a motive to burn their house, much less someone who's publicly claimed responsibility. And unlike the insurer in *Zoppo*, Liberty tracked down Mr. Carpenter's whereabouts during the fire: he was at the house. Moreover, Liberty had enough other evidence to reasonably conclude that the arson defense applied. Thus, it's okay that Liberty didn't talk with the police. Liberty's alleged noncompliance with the *National Fire Protection Association Guide for Fire and Explosion* is similarly irrelevant. The Carpenters cite no authority suggesting the *Guide* is the standard for good faith. Thus, there's no basis to conclude Liberty's investigation was inadequate.

*Fourth*, the Carpenters argue that Liberty's subsequent approval of their claim proves that the original denial was in bad faith. But Liberty changed its mind only after learning the Carpenters had repaired their house. If anything, this demonstrates Liberty's good faith: once it found evidence suggesting the Carpenters didn't start the fire, it approved their claim. So this argument fails, too.

*Fifth*, the Carpenters marshal an array of facts suggesting they lacked the motive and opportunity to start the fire. They say this proves Liberty's bad faith. But Liberty doesn't need undisputed evidence that the Carpenters had motive and opportunity. To prevail against the bad-faith allegation, Liberty only needs to show a reasonable justification to deny their claim. *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). It's met that burden.

For these reasons, we affirm the grant of summary judgment on the bad-faith claim.

B.

*Breach of Contract.* This claim hinges on three questions: (1) whether the fire damage constituted a "total loss" of the Carpenters' house, (2) whether the insurance policy's "Actual Cash Value" provision entitles them to additional payment, and (3) whether the policy's "Additional Living Expenses" coverage requires more than twelve months of payments.

1.

First, the total loss claim. Ohio law requires insurers to pay out the "whole amount" of certain policies if there's a "total loss" to an insured building. Ohio Rev. Code Ann. § 3929.25. To be a total loss, the building must have "lost its identity and specific character as a building." *Paterson-Leitch Co. v. Ins. Co. of N. Am.*, 366 F. Supp. 749, 757 (N.D. Ohio 1973) (citing *Pa. Fire Ins. Co. v. Drackett*, 57 N.E. 962, 963 (Ohio 1900)). It must be "of no value in repairing or rebuilding." *Pa. Fire*, 57 N.E. at 963.

The Carpenters' house was not a total loss. The house suffered no noticeable exterior damage. Indeed, the Carpenters were able to repair the house and sell it for $258,000. Thus, the house didn't lose its "identity and specific character" as a building. Nor was it without "value in repairing." *Id.* And because there's no total loss, the statute doesn't apply. We affirm the district court's grant of summary judgment on this issue.

2.

Next, the "actual cash value" provision, which we'll call the "repair and replacement coverage." Under that coverage, Liberty only pays the actual cost of damage until the Carpenters finish repairs. Once they do, Liberty must reimburse them for the cost of repair, up to several limits in the policy.

In their stipulations, the parties narrowly framed the legal question regarding this coverage. They stipulated that Liberty owes more money only if the sale of the house for $258,000 entitled the Carpenters to an additional payment. The district court accepted this stipulation. And it found that nothing in the policy ties the house's sale price to the Carpenters' rights to payment. So it granted Liberty summary judgment on this issue.

There was one problem with accepting this stipulation—stipulations about insurance coverage don't bind a court. *Crow v. Nationwide Mut. Ins. Co.*, 824 N.E.2d 127, 130 (Ohio Ct. App. 2004). While parties may stipulate facts, they can't stipulate their own version of the law. *Est. of Ralston v. Metro. Prop. & Cas. Ins. Co.*, 767 N.E.2d 789, 792 (Ohio Ct. App. 2001). And questions about coverage under an insurance policy are matters of law, not fact. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). Thus, "[p]arties or their attorneys cannot by agreement require the court to give to a written contract an effect other than its legal import." *Crow*, 824 N.E.2d at 131 (citation omitted). Once a contract is made, courts decide its legal significance, not the parties.

Here, Liberty has already paid the Carpenters some money, but it did not exhaust the limits under the repair and replacement coverage. And the Carpenters argue Liberty owes them more under that coverage. How much more, if any? That will hinge on several factual issues that aren't yet resolved. For example, Liberty's remaining liability depends on whether the Carpenters' unreimbursed repairs were "necessar[y]." R. 47-2, Pg. ID 361. And it depends on whether the repairs used "like construction" to the original fixtures. *Id.*

Because the district court accepted the parties' stipulations, the parties didn't squarely address these issues in their briefing. As a result, there are unresolved "material facts." Fed.

R. Civ. P. 56. Thus, on the issue of repair and replacement coverage, we affirm the denial of summary judgment to the Carpenters and vacate the grant of summary judgment to Liberty.

3.

Third, the "additional living expense" coverage. Under that coverage, Liberty agreed to reimburse certain living expenses while the Carpenters' house was unlivable. The coverage lasts until the Carpenters finish repairs or find a new place to live. An endorsement modifies that policy. It reads:

> [Liberty] will pay the amount of loss covered by [the additional living expense coverage] which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time [specified elsewhere in the policy]. R. 47-2, Pg. ID 362.

The district court correctly interpreted this endorsement as limiting coverage to twelve months. Every other court to analyze these or similar provisions has reached the same conclusion. *See Hayes v. Liberty Ins. Corp.*, 526 F. App'x 564, 566 (6th Cir. 2013); *Amro v. Liberty Ins. Corp.*, CV 12-2753, 2014 WL 12600975, at *1 (D. Minn. Sept. 11, 2014); *Liberty Pers. Ins. Co. v. Mayes*, 5:20-CV-00967, 2022 WL 2427726 (W.D. La. Feb. 11, 2022), *R. & R. adopted*, 2022 WL 2427746 (W.D. La. Mar. 4, 2022). And for good reason. To interpret the policy otherwise would render the twelve-month provision meaningless. And Ohio law requires courts to interpret contracts in a way that gives meaning to every provision. *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011).

Both parties agree Liberty paid twelve months of coverage, so there's no breach. Thus, we affirm the district court's grant of summary judgment to Liberty.

C.

*Damages*. In its first grant of summary judgment, the district court limited Liberty's possible liability to the insurance policy's limits. The Carpenters argue the court should allow emotional distress and consequential damages, too.

But those aren't available here. First, Ohio law limits emotional distress damages to specific kinds of contracts. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 665 (6th Cir. 2005). Insurance contracts aren't one of them. *See Frechette v. Health Recovery Servs., Inc.*, 2:19-CV-4453, 2022 WL 974383, at *4 (S.D. Ohio Mar. 31, 2022) (noting Ohio law has only allowed emotional distress damages for contracts involving builder-vendors, funeral home services, and settlement agreements for stalking).

The Carpenters fare no better with consequential damages. In some states, plaintiffs can recover damages beyond their policy's limit when an insurer wrongfully delays or refuses to pay out. *See* 47 A.L.R.3d 314 (1973). Ohio isn't one of those states. *See Haas v. Pac. Mut. Life Ins. Co.*, 41 N.E.2d 263, 266 (Ohio Ct. App. 1941) (upholding dismissal of a claim for consequential damages, even though insurer had foreseen those damages). In Ohio, insureds can't recover beyond their policy's limits for a breach of contract.

Thus, we affirm the district court's grant of summary judgment as to damages.

III.

*Waiver and Estoppel*. The Carpenters argue that because Liberty waited years before approving their claim, it has waived its rights to enforce their policy's limits. They also say Liberty should be estopped from enforcing those limits. Both arguments fail.

First, waiver. In Ohio, litigants can't use the doctrine of waiver to expand insurance coverage beyond a policy's terms. *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 597 N.E.2d 1096, 1104 (Ohio 1992). Because that's what the Carpenters attempt here, their argument fails.

Next, estoppel. To invoke equitable estoppel, the Carpenters need to show (1) Liberty caused them to believe certain facts and (2) the Carpenters detrimentally changed their position in reliance on those facts. *Chubb v. Ohio Bureau of Workers' Comp.*, 690 N.E.2d 1267, 1270 (Ohio 1998). If the Carpenters can make this showing, they can stop Liberty from backpedaling on those facts. *Id.* For example, imagine Liberty initially told the Carpenters that it would cover all their repairs. And imagine that the Carpenters, relying on Liberty's promise, spent money repairing their house. In that scenario, a court could prevent Liberty from later denying the Carpenters' claims.

But this case presents the reverse scenario. Liberty led the Carpenters to believe that it would *not* cover their repairs. And the Carpenters cite no case suggesting Liberty's initial denial prevents it from continuing to deny certain coverage later. In other words, Liberty wouldn't be allowed to promise full coverage and then deny it. But Liberty *is* allowed to promise denial and then deny coverage. So estoppel is no help for the Carpenters, either.

\* \* \*

We affirm in part, vacate in part, and remand for further proceedings on the breach-of-contract claim.